## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LABORERS' PENSION FUND and )
LABORERS' WELFARE FUND OF THE )
HEALTH AND WELFARE DEPARTMENT )
OF THE CONSTRUCTION AND GENERAL )
LABORERS' DISTRICT COUNCIL OF )
CHICAGO AND VICINITY, and JAMES S. )
JORGENSEN, Administrator of the Funds, )
)
    and )
)
MIKE SHALES, JOHN BRYAN, SR. AL )
OROSZ, DAN BREJEC, TOBY KOTH, and )
VERN BAUMANN, not individually but as )
Trustees of THE FOX VALLEY LABORERS' )
HEALTH AND WELFARE FUND, )
)
    and )
)
MIKE SHALES, JOHN BRYAN SR., AL )
OROSZ, TOBY KOTH, GORDON ANDERSON )
and DAN BREJEC, not individually but as )
Trustees of THE FOX VALLEY LABORERS' )
PENSION FUND, )
)
                     **Plaintiffs,** )
)
    v. )
)
BREWER CONCRETE CONSTRUCTION, )
INC. an Illinois corporation, and SCOTT )
DAVID BREWER, individually, )
)
                     **Defendants.** )

**Case No.:** FILED: APRIL 14, 2008
08 CV 2103   JH
JUDGE KENNELLY
MAGISTRATE JUDGE VALDEZ

### COMPLAINT

Plaintiffs, Laborers' Pension Fund and Laborers' Welfare Fund of the Health and Welfare

Department of the Construction and General Laborers' District Council of Chicago and Vicinity

(collectively "Chicago Funds") James S. Jorgensen (hereinafter "Jorgensen"), Administrator of

the Chicago Funds, Mike Shales, John Bryan, Sr. Al Orosz, Dan Brejec, Toby Koth and Vern

Baumann, not individually but as Trustees of the Fox Valley Laborers' Health and Welfare Fund,

and Mike Shales, John Bryan, Sr., Al Orosz, Toby Koth, Gordon Anderson, and Dan Brejec, not

individually but as Trustees of the Fox Valley Laborers' Pension Fund (referred to hereinafter

collectively with the Fox Valley Laborers' Welfare Fund as the "Fox Valley Funds" and the Fox

Valley Funds referred to hereinafter with the Chicago Funds collectively as the "Funds"), by their

attorneys Patrick T. Wallace, Jerrod Olszewski, Christina Krivanek, Amy N. Carollo, and

Charles Ingrassia, and for their Complaint against Defendants Brewer Concrete Construction,

Inc. and Scott David Brewer, state:

## COUNT I

### (Failure To Pay Benefit Contributions)

1.      Jurisdiction is based on Sections 502(e)(1) and (2) and 515 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§1132 (e)(1) and

(2) and 1145, Section 301(a) of the Labor Management Relations Act ("LMRA") of 1947 as

amended, 29 U.S.C. §185(a), and 28 U.S.C. §1331.

2.      Venue is proper pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. §1132(e)(2),

and 28 U.S.C. §1391 (a) and (b).

3.      The Funds are multiemployer benefit plans within the meanings of Sections 3(3)

and 3(37) of ERISA.  29 U.S.C. §1002(3) and 37(A).  They are established and maintained

pursuant to their respective Agreements and Declarations of Trust in accordance with Section

302(c)(5) of the LMRA.  29 U.S.C. § 186(c)(5).  The Funds have offices and conduct business

within this District.

4.     Plaintiff James S. Jorgensen ("Jorgensen") is the Administrator of the Chicago Funds, and has been duly authorized by the Funds' Trustees to act on behalf of the Chicago Funds in the collection of employer contributions owed to the Chicago Funds and to the Construction and General District Council of Chicago and Vicinity Training Fund, and with respect to the collection by the Chicago Funds of amounts which have been or are required to be withheld from the wages of employees in payment of Union dues for transmittal to the Construction and General Laborers' District Council of Chicago and Vicinity (the "Union"). With respect to such matters, Jorgensen is a fiduciary of the Chicago Funds within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).

5.     Plaintiffs Mike Shales, John Bryan, Sr. Al Orosz, Dan Brejec, Toby Koth and Vern Baumann, are Trustees of the Fox Valley Laborers' Health and Welfare Fund.  With respect to the collection of contributions owed to the Fox Valley Laborers' Health and Welfare Fund, those individuals are fiduciaries of the Fox Valley Laborers' Health and Welfare Fund within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).  Plaintiffs Mike Shales, John Bryan, Sr., Al Orosz, Toby Koth, Gordon Anderson, and Dan Brejec, are Trustees of the Fox Valley Laborers' Pension Fund.  With respect to the collection of contributions owed to the Fox Valley Laborers' Pension Fund, those individuals are fiduciaries of the Fox Valley Laborers' Pension Fund within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).

6.     Defendant Brewer Concrete Construction, Inc., (hereinafter "Brewer Concrete" or the "Company") is an Illinois corporation.  The Company does business within this District and is an employer within the meaning of Section 3(5) of ERISA, 29 U.S.C. §1002(5), and Section 301(a) of the LMRA, 29 U.S.C. §185(c).

3

7.      The Union is a labor organization within the meaning of 29 U.S.C. §185(a).  The Union and the Company have been parties to successive collective bargaining agreements, the most recent of which became effective June 1, 2006 ("Agreement"). (A copies of the "short form" Agreement entered into between the Union and the Company which Agreement adopts and incorporates Master Agreements between the Union and various employer associations, and also binds the Company to the Funds' respective Agreements and Declarations of Trust, is attached hereto as Exhibit A.)

8.      Defendant Scott David Brewer (hereinafter "Brewer") is and was at all times relevant the President and a shareholder of the Company.

9.      The Chicago Funds have been duly authorized by the Construction and General Laborers' District Council of Chicago and Vicinity Training Fund (the "Training Fund"), the Midwest Construction Industry Advancement Fund ("MCIAF"), the Chicagoland Construction Safety Council (the "Safety Fund"), the Laborers' Employers' Cooperation and Education Trust ("LECET"), the Concrete Contractors' Association of Greater Chicago ("CCA"), the CDCNI/CAWCC Contractors' Industry Advancement Fund (the "Wall & Ceiling Fund"), the CISCO Uniform Drug/Alcohol Abuse Program ("CISCO"), the Laborers' District Council Labor Management Committee Cooperative ("LDCLMCC"), the CARCO Industry Advancement Fund ("CARCO"), and the Illinois Small Pavers' Association ("ISPA") to act as an agent in the collection of contributions due to those Funds.

10.     The Agreement, the Chicago Funds' respective Agreements and Declarations of Trust, and the Fox Valley Funds' respective Agreements and Declarations of Trust obligate the Company to make contributions on behalf of its employees covered by the Agreement for

4

pension benefits, health and welfare benefits, and/or benefits for the Training Fund and to submit monthly remittance reports in which the Company, *inter alia*, identifies the employees covered under the Agreement and the amount of contributions to be remitted to the Funds on behalf of each covered employee.

11.     The Agreement, the Chicago Funds' respective Agreements and Declarations of Trust, and the Fox Valley Funds' respective Agreements and Declarations of Trust require the Company to submit its books and records to the Funds on demand for an audit to determine benefit contribution compliance.

12.     The Agreement requires the Company to obtain and maintain a surety bond to guaranty the payment of future wages, pension and welfare benefits.

13.     Notwithstanding the obligations imposed by the Agreement, the Chicago Funds' respective Agreements and Declarations of Trust, and the Fox Valley Funds' respective Agreements and Declarations of Trust, the Company has:

(a)     failed to report and pay contributions owed to Plaintiffs Chicago and Fox Valley Laborers' Pension Fund from January 2008 forward, thereby depriving the Pension Funds of contributions, income and information needed to administer the Fund and jeopardizing the pension benefits of the participants and beneficiaries:

(b)     failed to report and pay all contributions owed to Plaintiffs Chicago and Fox Valley Welfare Funds from January 2008 forward, thereby depriving the Welfare Fund of contributions, income and information needed to administer the Funds and jeopardizing the health and welfare benefits of the participants and beneficiaries;

(c)      failed to report and pay all contributions owed to Laborers' Training Fund from January 2008 forward, thereby depriving the Laborers' Training Fund of contributions, income and information needed to administer the Fund and jeopardizing the training fund benefits of the participants and beneficiaries;

(d)      failed to report and pay all contributions owed to one or more of the other affiliated funds identified above from February 2008 forward, thereby depriving said fund(s) of contributions, income and information needed to administer said fund(s) and jeopardizing the benefits of the participants and beneficiaries; and

(e) failed to obtain and maintain a surety bond.

14.      The Company failed to submit timely payment of benefit reports to the Chicago Funds for the period of July through December 2007.  Pursuant to the terms of the Agreement and the Chicago Funds' respective Agreements and Declarations of Trust, the Company owes $23,136.76 in accumulated liquidated damages, plus interest, on the late paid reports for the period of July through December 2007.

15.      The Company failed to submit timely payment of benefit reports to the Fox Valley Funds for the period of July through December 2007.  Pursuant to the terms of the Agreement and the Fox Valley Funds' respective Agreements and Declarations of Trust, the Company owes $3,240.44 in accumulated liquidated damages and interest on the late paid reports for the period of July through December 2007.

16.      On September 10, 2007, the Company entered into an Installment Note ("Note") to pay certain amounts due to the Chicago and Fox Valley Funds.  Simultaneously with the execution of the Note, Defendant Scott David Brewer signed a Guaranty of Payment and

6

Indemnification Agreement ("Guaranty") agreeing to personally guaranty the amounts due on the Note. The Company and Brewer also executed a Commercial Security Agreement granting the Funds and the Union and security interest in the assets of the Defendants. True and accurate copies of the Note, Guaranty and Commercial Security Agreement are attached hereto respectively as Exhibits B, C and D.

17.     Paragraph 1 of the Guaranty provides in relevant part:

> The Guarantor also agrees to be personally liable for all monthly benefit contributions, union dues and/or wages owed from the Company to the Funds, the District Council all ancillary funds, and/or the participants that are due at the time the Note and Guaranty are entered into and/or are incurred and become due and owing for the duration of the Note, including all interest, liquidated damages, audit costs, attorneys' fees and costs.

18.     The debts owed by the Company that are the subject matter of this Complaint were due at the time the Note and Guaranty are entered into or were incurred and became due and owing during the Note's existence. Accordingly, Defendant Scott David Brewer is liable for all amounts due to the Funds.

19.     The Company's failure to submit payment of benefit contributions and failure to obtain and maintain a surety bond violates Section 515 of ERISA, 29 U.S.C. §1145, and Section 301 of the LMRA. 29 U.S.C. §185.

20.     Pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. §1132 (g)(2), Section 301 of the LMRA, 29 U.S.C. §185, and the terms of the Agreement, the Chicago Funds' respective Agreements and Declarations of Trust, the Fox Valley Funds' respective Agreements and Declarations of Trust, and the Guaranty, the Defendants are liable to the Funds for unpaid contributions, as well as interest and liquidated damages on the unpaid contributions,  reasonable

attorneys' fees and costs, and such other legal and equitable relief as the Court deems appropriate.

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against Defendants Brewer Concrete Construction and Scott David Brewer:

a.      ordering the Defendants to submit and pay current reports and contributions and submit the Company's books and records to an audit upon demand for the period of November 1, 2005 forward:

b.      entering judgment in sum certain in Plaintiffs' favor and against Defendants on the amounts shown due and owing pursuant to the audit including unpaid contributions, interest, liquidated damages, accumulated liquidated damages and interest on late paid reports, audit costs, and Plaintiffs' attorneys' fees and costs;

c.      ordering the Company to obtain and maintain a surety bond; and

d.      awarding Plaintiffs any further legal and equitable relief as the Court deems appropriate.

## COUNT II

### (Failure To Submit Union Dues)

21.      Plaintiffs reallege paragraphs 1 through 20 of Count I.

22.      Pursuant to agreement, the Chicago Funds have been duly designated to serve as collection agents for the Union in that the Chicago Funds have been given the authority to collect from employers union dues which have been or should have been deducted from the wages of covered employees.

8

23.    Notwithstanding the obligations imposed by the Agreement the Company has failed to submit and pay dues that were or should have been withheld from the wages of its employees performing covered work for the period of February 2008 forward, thereby depriving the Union of income and information necessary to determine dues submission compliance.

24.    Pursuant to the Agreement and the Guaranty, Defendants are liable to the Funds for the unpaid union dues, liquidated damages, and reasonable attorneys' fees and costs as the Union's collection agent and such other legal and equitable relief as the Court deems appropriate.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants Brewer Concrete Construction, Inc. and Scott David Brewer for the Union dues and liquidated damages owed together with all attorneys' fees and costs, and any other legal and equitable relief as the Court deems appropriate.

## COUNT III

### (Violation of Illinois Wage Payment and Collection Act)

25.    Plaintiffs reallege paragraphs 1 through 20 of Count 1 and paragraphs 22 through 24 of Count II.

26.    This Court has supplemental jurisdiction over this Count pursuant to 28 U.S.C. § 1367.

27.    Venue is proper pursuant to 28 U.S.C. § 1391(b).

28.    During the period of February 2008 forward, Defendant Company's employees performed work for the Company and earned wages.

29.    Employees of the Defendant Company performing work defined as covered under the terms of the Agreement executed written assignments authorizing and directing the

9

Defendant Company to withhold monies from their wages for remittance to the Union in satisfaction of dues and fee obligations.

30.     For the period of February 2008 forward, the Company has deducted money from the wages of its employees pursuant to the wage deductions signed by the employees but failed to properly remit the payments to the Union.

31.     Plaintiffs have demanded payment of the amounts due to the Union but the Company has failed to remit payment of those amounts.

32.     Defendant Company's conduct violates the Illinois Wage and Payment Collection Act, 820 ILCS 115/1 et seq.

33.     At all times material, Defendant Scott David Brewer acted directly in the interest of Defendant Company in relation to its employees.

34.     At all times material, Defendant Scott David Brewer controlled the terms of employment of Defendant Company's employees and exercised control over the payment of wages and the withholding of monies from the employees' wages.

35.     At all times relevant, Defendant Scott David Brewer controlled disbursements made by Defendant Company including the issuance of payroll checks and the remittance of dues to the Union.

36.     Defendant Scott David Brewer knowingly permitted Defendant Company to retain the wages withheld from such employees' paychecks rather than remitting said funds to the Union.

37.     Defendant Scott David Brewer knowingly and actively conducted or participated in the actions of Defendant Company alleged above causing injury to the Union.  As such, Scott

10

David Brewer is an "employer" as defined in the Illinois Wage Payment and Collection Act, 820 ILCS 115/13, and is personally liable for the failure to properly deduct monies from employees' wages and remit those monies to the Union for the payment of dues.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of the Plaintiffs and against Defendants Brewer Concrete Construction, Inc. and Scott David Brewer directing Defendants to submit union dues and reports, ordering Defendants to submit the Company's books and records to an audit if such is requested by Plaintiffs, enter judgment in favor of Plaintiffs and against Defendants for the amount of union dues owed, plus liquidated damages and the Funds' reasonable attorneys' fees and costs pursuant to 820 ILCS 115/13 and the Attorneys Fees in Wage Actions Act, 705 ILCS 225/1. Plaintiffs also request that this Court grant such other legal and equitable relief as the Court deems just and proper.

**COUNT IV**

**(Conversion)**

38.     Plaintiffs reallege paragraphs 1 through 20 of Count 1, paragraphs 22 through 24 of Count II, and paragraphs 26 through 37 of Count III.

39.     Pursuant to the wage assignments executed by each of the Defendant Company's employees, the Union has a right to immediate possession of those monies on the tenth day of the month following the month in which the wages were earned and the deductions were made from employees' wages.

40.     For the period of February 2008 forward, Defendants Company and Scott David Brewer have deducted and withheld monies from employees' wages for union dues and appropriated that money for their own use and benefit thereby depriving the Union of its

11

property. At that time, Defendants Company and Scott David Brewer were without right to possession of those monies withheld from the employees' wages.

41.     Through the actions enumerated above, Defendants Company and Scott David Brewer have wrongfully converted the Union's property and should be justly required to pay the Union the full value of that property.

WHEREFORE, Defendants Brewer Concrete Construction, Inc. and Scott David Brewer should be ordered jointly and severally to submit all dues reports and the monies due thereunder, submit the Company's books and records to an audit to verify all amounts dues, and submit payment in full of all monies wrongfully converted, and such other relief that is equitable and just.

## COUNT V

### (Default On Installment Note)

42.     Plaintiffs reallege paragraphs 1 through 20 of Count 1, paragraphs 22 through 24 of Count II, paragraphs 26 through 37 of Count III, and paragraphs 39 through 41 of Count IV.

43.     Paragraph 6 of the Note requires the Company to stay current on all obligations to the Funds including, but not limited to, the obligation to stay current on reports to the Funds. In the event that the Company fails to stay current on its obligations to the Funds, the Funds may accelerate the amounts due on the Note.

44.     Because the Company has failed to stay current on the obligations to submit benefit contributions to the Funds, the Funds are entitled to accelerate and have judgment confessed in favor of the Funds and against Defendants for the remaining $44,171.10 due on the

12

Note, plus liquidated damages, interest, and attorneys' fees and costs under paragraphs 5 and 6 of the Note.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants Brewer Concrete Construction, Inc. and Scott David Brewer for $44,171.10 due on the Note plus any liquidated damages and interest due on the Note and Plaintiffs' attorneys' fees and costs. Plaintiffs further request that the Court grant Plaintiffs any further relief that the Court deems just and equitable.

April 14, 2008

                                          Laborers' Pension Fund, et al.


                                          By:  /s/ Patrick T. Wallace
                                                 Patrick T. Wallace

Patrick T. Wallace
Jerrod Olszewski
Christina Krivanek
Amy N. Carollo
Charles Ingrassia
Laborers' Pension and Welfare Funds
Sub Office, 111 W. Jackson Blvd., Suite 1415
Chicago, IL  60604
(312) 692-1540

# CONSTRUCTION & GENERAL
## DISTRICT COUNCIL OF CHICAGO AND VICINITY
### AFFILIATED WITH THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO

INDEPENDENT CONSTRUCTION INDUSTRY COLLECTIVE BARGAINING AGREEMENT

It is hereby stipulated and agreed by and between **Brenner Concrete Const Inc** ("Employer") and the Construction and General Laborers' District Council of Chicago and Vicinity Laborers' International Union of North America, AFL-CIO ("Union"), representing and encompassing its affiliated Local Unions, including Local Nos. 1, 2, 4, 5, 6, 76, 96, 118, 149, 152, 225, 269, 288, 582, 681, 1001, 1006, 1035, 1092 together with any other Local Unions that may come within the Union's jurisdiction, Local Union, and encompassing the appropriate General Craft Union, Chicago, Illinois.

...

RECEIVED
MAR 2 9 2004
FVIAR
34314

WHITE - LOCAL UNION ...

EXHIBIT
A

## INSTALLMENT NOTE

Installment Note ("Note") is made between the Fox Valley Laborers' Health and Welfare Fund ("Welfare Fund") and the Fox Valley Laborers' Pension Fund ("Pension Fund") (collectively the "Fox Valley Funds") on its own behalf and on behalf of the Laborers' Pension Fund and Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively the "Laborers' Funds") and the Construction and General Laborers' District Council of Chicago and Vicinity (hereinafter the "District Council")(Fox Valley Funds, Laborers' Funds and District Council collectively referred to as the "Funds") and Brewer Concrete Construction, Inc. (the "Company"), and Scott Brewer ("Brewer").

WHEREAS, the Company has at all relevant times been a party to a collective bargaining agreement (the "CBA") with the Construction and General Laborers' District Council of Chicago and Vicinity, the terms of which obligate the Company to make contributions to the above referenced Fox Valley Funds and Laborers' Funds on behalf of its covered employees, and to remit payment of all employee union dues to the District Council;

WHEREAS, the Company has failed to timely pay certain contributions owed to the Fox Valley Funds for the period of December 2006 through June 2007 and to the Laborers' Funds for May 2007 through June 2007;

WHEREAS, as a result of its delinquencies to the Fox Valley Funds, the Fox Valley Funds filed a lawsuit (hereinafter "lawsuit") captioned in Shales, et al. v. Brewer Concrete Construction, Inc., et al., Case No. 07 C 2290 in the United States District Court for the Northern District of Illinois;

WHEREAS, the Company desires to settle the Fox Valley Funds lawsuit and to pay the contribution amounts calculated to be owed to the Fox Valley Funds and the Laborers' Funds for all delinquencies owed through June 2007, together with costs, interest, liquidated damages, and attorneys' fees as set forth below; and the Fox Valley Funds and the Laborers' Funds have agreed to pursue the delinquencies owed to each of them collectively;

THE PARTIES AGREE AS FOLLOWS:

1.    The Company and Brewer will pay a total amount of $45,876.37 to the Fox Valley Funds and $72,561.37 to the Laborers' Funds ($118,437.74 collectively referred to as the "Delinquent Amounts") plus accruing interest, comprised of the following:

| | **Fox Valley Funds** |
|---|---|
| Contributions  (12/06-06/07) | $ 34,485.53 |
| Liquidated Damages (20%) | $ 6,897.11 |
| Attorneys fees and costs | $  4,493.73 |
| **Total** | **$ 45,876.37** |



EXHIBIT
B

|                                      | Laborers' Funds |
|--------------------------------------|-----------------|
| Welfare (05/07-06/07)                | $27,241.72      |
| Pension (05/07-06/07)                | $18,435.38      |
| MARBA (05/07-06/07)                  | $    130.20     |
| Training (05/07-06/07)               | $    678.17     |
| Cisco  (05/07-06/07)                 | –               |
| Subtotal                             | $46,485.47      |
| Liquidated Damages @ 20%             | $  9,271.05     |
| Interest                             | $     93.53     |
| Accumulated Penalties - Pension      | $     66.67     |
| Attorneys Fees & Costs @ 7/5/07      | $16,644.65      |
| **Total**                            | **$72,561.37**  |

2.   The Company and Brewer will make an initial down payment ("down payment") totaling $33,753.13, payable on September 5, 2007 and September 15, 2007, as follows: Company and Brewer will make one payment of $13,000.00, which shall be payable to the Fox Valley Funds and remitted for receipt by September 5, 2007; and Company and Brewer shall make a second payment totaling $20,753.13, to be divided between the Funds so that $9,422.97 shall be payable to the Fox Valley Funds and $11,330.16 shall be payable to the Laborers' Funds, both payments to be received by September 17, 2007. All payments referenced in this Paragraph 2 to be collectively referred to as the "down payment." All subsequent payments under this Note for the balance due to the Fox Valley Funds and the Laborers' Funds, shall be payable as set forth in Paragraph 3.

3.   The Company and Brewer, in addition to the down payment described in Paragraph 2 above, shall make twelve (12) consecutive equal monthly installments of $2,165.50 to the Fox Valley Funds and twelve (12) consecutive equal monthly installments of $5,196.35 to the Laborers' Funds, both payments commencing on October 15, 2007, and continuing through September 15, 2008, according to the following schedule:

|                    | FOX VALLEY FUNDS | LABORERS' FUNDS |
|--------------------|------------------|-----------------|
| October 15, 2007   | $2,165.50        | $5,196.35       |
| November 15, 2007  | $2,165.50        | $5,196.35       |
| December 15, 2007  | $2,165.50        | $5,196.35       |
| January 15, 2008   | $2,165.50        | $5,196.35       |
| February 15, 2008  | $2,165.50        | $5,196.35       |
| March 15, 2008     | $2,165.50        | $5,196.35       |
| April 15, 2008     | $2,165.50        | $5,196.35       |
| May 15, 2008       | $2,165.50        | $5,196.35       |
| June 15, 2008      | $2,165.50        | $5,196.35       |
| July 15, 2008      | $2,165.50        | $5,196.35       |

|                     |            |            |
|---------------------|------------|------------|
| August 15, 2008     | $2,165.50  | $5,196.35  |
| September 15, 2008  | $2,165.50  | $5,196.35  |

4.     The Company and Brewer will remit all payments due under this Agreement as follows: all payments to the Fox Valley Funds shall be remitted to the Fox Valley Funds' attorneys, Dowd, Bloch & Bennett, 8 South Michigan Avenue, Suite 1900, Chicago, IL 60603; and all payments to Laborers' Funds shall be remitted directly Laborers' Funds, c/o Jim Fosco, 11465 Cermak Road, Westchester, Illinois, 60154.

5.     Payments made pursuant to this Installment Note shall be considered "contributions" as defined under the terms of the CBA between the Company and the Funds' respective Agreements and Declarations of Trust.  In the event the Company and Brewer fail to pay its contributions due to any of the Funds, all contributions to all Funds shall be considered delinquent and all charges which apply to the late payment of contributions under the terms of the CBA and the Funds' respective Agreements and Declaration of Trusts shall apply, including, but not limited to the assessment of interest and liquidated damages. Further, in the event the Company and Brewer fail to make timely payments described in this Note, all amounts described in paragraph 1 shall immediately become due on the 1st day following the date on which payment should have been received under this Note and the Company and Brewer further agree to pay all attorneys' fees and costs incurred by the Funds in any action to enforce any part of this Installment Note.

6.     The Installment Note is conditioned upon the Company staying current on its obligations to each of the Funds under the terms of the CBA and the Funds' respective Agreements and Declaration of Trust.  In the event that the Company fails to maintain its obligations under the terms of the CBA and the Funds' respective Agreements and Declaration of Trusts, including but not limited to its obligations to submit timely contribution reports and to make timely contributions required by the CBA, the Funds shall have the right to accelerate and collect all amounts due to all Funds under this Installment Note, plus payment of all attorneys' fees and costs incurred in any action to accelerate this Installment Note.  Furthermore, not withstanding any right to accelerate payment against the Company, the Funds may also enforce the terms of this Note against the individual guarantor who is jointly and severally liable with the Company under the terms of this Note.

7.     The Funds' remedies under this Note shall be cumulative and concurrent and may be pursued singly, successively, or together against the Company and Brewer and the Funds may resort to every other right or remedy available at law or in equity.  Failure of the Funds to accelerate the maturity of this Note shall not constitute a waiver of the right to exercise such option.  The Funds shall not by any other omission or act be deemed to waive any of its rights or remedies hereunder unless such waiver is in writing and signed by the Funds, and then only to the extent specifically set forth therein.  A waiver in connection with one event shall not be construed as continuing or as a bar to or waiver of

3

any right or remedy in connection with a subsequent event or by any other Fund.

8.  Should the Funds extend the time of payment of any amounts due under this Note such extension shall not modify or release any liability of the Company or individual guarantor under this Note or any rights of recourse the Funds may have against them.

9.  The Company shall have the right to prepay the entire amount due under this Note prior to the date upon which the payment is due without penalty and without payment of any precalculated Note interest that has not accrued as of the date full payment has been made.

10.  The Company and Brewer understand and agrees that this Installment Note is based on reports submitted by the Company to each of the Funds and that each of the Funds reserve the right to conduct an audit to determine benefit contribution compliance for any unaudited period, including periods covered under this Note and to collect any unpaid contributions, union dues, interest, liquidated damages, and audit costs as shown in the audit.

11.  The Company further agrees to obtain and maintain a surety bond in favor of the Funds to insure the payment of wages and benefit contributions as required under the terms of the CBA.

12.  To secure this Note, the Company and Brewer agree to execute a continuing security agreement in favor of the Funds named herein and that said agreement shall continue until all obligations under this Note and the CBA, are satisfied.

13.  The Company and Brewer acknowledge that nothing in this Note shall cover delinquencies beyond the work month of June 2007 and that the Company's obligations to remit contributions/union dues and reports when due pursuant to the CBA shall continue.  The failure of the Company to timely remit contributions/union dues and reports for any month including July 2007, shall constitute a breach of this Note and all the terms as set forth in Paragraph 5 above shall be applicable in such a case.

14.  The Funds shall have a right to apply all payments under this Note as they determine regardless as to whom the payment is designated.

15.  The Company and Brewer agree that they shall be responsible for payment of any additional attorneys fees incurred by the Funds as a result of their effort to enforce the terms of this Note and/or to collect any sums that may be due under the Note.

16.  A faxed copy shall be as valid as an original.

4

APR-09-2008 02:44PM  FROM-FV LABORERS                                           T-570  P.002/002  F-237
APR-09-2008 10:04AM  FROM-FV LABORERS          041 022 1224;       Apr-9-08  2:41PM;         Page 6/6
                                                                   T-567  P.005/006  F-232
    89/18/2887  84:49    17735245833
    89/18/2887  15:48    3123726599            BREWER CONCRETE                 PAGE  82
                                               DOWD BLOCH & BENNETT            PAGE  85/25

**The parties are in agreement with the above and signify by signing below:**

On behalf of the Fox Valley Laborers Health & Welfare and Pension Funds:

By: _____       Date: 4/9/08

By: _____       Date: 4/9/08

On behalf of Brewer Concrete Construction, Inc.:

By: _____       Date: 9/10/07

Name: _____Scott Brewer_____

Title: _____President_____


Individual Guarantor:

By: _____       Date: 9/10/07

Name: _____Scott Brewer_____

Home Address: 321 E 13th St,
Chicago IL  60616

RECEIVED
APR -9 2008
F.V. LABORERS

5

## GUARANTY OF PAYMENT AND INDEMNIFICATION

This Guaranty ("Guaranty") is made as of _____ by the undersigned, Scott Brewer, (the "Guarantor"), to and for the benefit of the Fox Valley Laborers' Health and Welfare Fund ("Welfare Fund") and the Fox Valley Laborers' Pension Fund ("Pension Fund") (collectively the "Fox Valley Funds") on its own behalf and on behalf of the Laborers' Pension Fund and Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively the "Laborers' Funds") and the Construction and General Laborers' District Council of Chicago and Vicinity (hereinafter the "District Council")(Fox Valley Funds, Laborers' Funds and District Council collectively referred to as the "Funds").

WHEREAS, **Brewer Concrete Construction, Inc. (the "Company")**, has agreed to pay a total of **$118,437.74** to the Funds for delinquent contributions and other sums owed to the Funds and to be paid under the terms of an Installment Note (the "Note").

WHEREAS, the Funds are unwilling to enter into the Note unless the guarantor executes this Guaranty; and

WHEREAS, the Guarantor has a financial interest in the Company and will be benefitted by the Note;

NOW WHEREAS, in consideration of the foregoing, the Guarantor agrees as follows:

1.    Guaranty of Payment and Indemnification.  The undersigned guarantees, absolutely and unconditionally: (a) the payment when due of the entire principal indebtedness and all interest evidenced by the Note during the twelve (12) month payment period including interest, liquidated damages for late or unpaid payments due on the Note; and (b) the full and complete payment of any and all fees and costs incurred pursuant to default under the terms of the Note; whether litigation is involved or not, and if involved, whether at the trial or appellate levels or in pre- or post- judgment bankruptcy proceedings in enforcing or realizing upon the obligations of the Guarantor hereunder (the obligations of Guarantor under this Paragraph 1 are collectively hereinafter referred to as the "Obligations").  The Guarantor also agrees to be personally liable for all monthly benefit contributions, union dues and/or wages owed from the Company to the Funds, the District Council, all ancillary funds, and/or the participants, that are due at the time the Note and Guaranty as entered into and/or are incurred and become due and owing for the duration of the Note, including all interest, liquidated damages, audit cost, attorneys' fees and costs.

2.    Continuing Guaranty.  This Guaranty shall be a continuing Guaranty, and shall not be discharged, impaired or affected by: (a) the existence or continuance of any obligation on the part of the Company with respect to the Note; (b) any forbearance or extension of time of payment of the Note; (c) the validity or invalidity of the Note; (d) any defenses whatsoever that the Company or any of the parties thereto may have to the performance or observance of any term, covenant or condition contained in the Note; (e) the existence or non-existence of the


EXHIBIT
C

Company as a legal entity; (f) any limitation or exculpation of (other than the payment and performance in full of all the Company's Obligations) that Guarantor may have as to his undertakings, liabilities and obligations hereunder, including any defenses based upon any legal disability of the Company or any discharge or limitation of the disability of the Company, whether consensual or arising by operation of law or any bankruptcy, insolvency or debtor-relief proceedings, or from any other cause, each and every such defense being hereby waived by the Guarantor.

3.     <u>Waivers</u>. Guarantor waives diligence, presentment, protest, notice of dishonor, demand for payment, extension of time of payment, notice of acceptance of this Guaranty, non-payment at maturity and indulgences and notices of every kind as provided for under this Guaranty. It is the intention of this Guaranty that Guarantor shall remain liable as principal, notwithstanding any act, omission or thing which might otherwise operate as a legal or equitable discharge of Guarantor, until all of the Company's Obligations shall have been fully paid and performed.

4.     <u>Subrogation</u>. Notwithstanding anything to the contrary elsewhere contained herein or in the Note, the Guarantor expressly waives with respect to the Company, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to set off or to any other rights that could accrue to a surety against a principal, to the Guarantor against a maker or obligor, to an accomodation party against the party accomodated, or to a holder or transferer against a maker, and which the guarantor may have or hereafter acquire against the Company in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty or the Note. The Guarantor agrees that he shall not have or assert any such rights against the Company or its successors and assigns or any other person (including a surety), either directly or as an attempted set off to any action commenced against the Guarantor, the Company (as borrower or in any other capacity) or any other person.

5.     <u>Independent Obligations</u>. The Funds may enforce this Guaranty without first resorting to or without first having recourse to the Note; provided, however, that nothing herein contained shall preclude the Funds from suing on the Note or from exercising any other rights; and the Funds shall not be required to institute or prosecute proceedings to recover any deficiency as a condition of any payment hereunder or enforcement thereof.

6.     <u>Acceleration</u>. In the event that payments due under the Note shall be accelerated, the Guarantor's Obligations hereunder shall also be accelerated without further notice from the Funds.

7.     <u>Effect of Bankruptcy</u>. This Guaranty shall continue in full force and effect notwithstanding the institution by or against the Company of bankruptcy, reorganization, readjustment, receivership or insolvency proceedings of any nature, or the disaffirmance of the Note in any such proceedings, or others.

8.     <u>Termination</u>. This Guaranty shall remain in full force and effect as to the Guarantor until all of the Company's Obligations under the Note outstanding shall be finally and

irrevocably paid in full. Payment of all of the Company's Obligations from time to time shall not operate as a discontinuance of this Guaranty. If after receipt of any payment of all or any part of the Company's Obligations, the Funds are for any reason compelled to surrender such payment to any person or entity, because such payment is determined to be void or voidable as a preference, impermissible set off, or a diversion of trust fund, or for any reason, this Guaranty shall continue in full force notwithstanding any contract action which may have been taken by the Funds in reliance upon such payment, any such contrary action so taken shall be without prejudice to the Funds' rights under this Guaranty and shall be deemed to have been conditioned upon such payment having become final and irrevocable.

9.      The Company's Financial Condition. The Guarantor assumes full responsibility for keeping fully informed of the Company's financial condition and all other circumstances affecting the Company's ability to perform its Obligations, and the Funds will have no duty to report to Guarantor any information which the Funds receive about the Company's financial condition or any circumstances bearing on its ability to perform.

10.     Expenses. The undersigned agrees to pay and reimburse the Funds for all costs and attorneys' fees, which they may expend or incur in the enforcement of this Guaranty or any of the Company's Obligations under the Note.

11.     Delay, Cumulative Remedies. No delay or failure of the Funds to exercise any right to remedy against the Company or Guarantor will be construed as a waiver of that right or remedy. All remedies of the Funds against the Company and the Guarantor are cumulative.

12.     Binding Effect. This Guaranty shall incur to the benefit of and may be enforced by the Funds, and shall be binding upon and enforceable against the Guarantor and the Guarantor's heirs, legal representatives, successors and assigns. In the event of the death of the Guarantor, Obligations of such deceased Guarantor shall continue in full force and effect against his estate, personal representatives, successors and assigns. Without limiting the generality of the foregoing, the Funds (or their successors and assigns) may from time to time and without notice to the undersigned, assign any and all of their rights under this Guaranty without in any way affecting or diminishing the Obligations of the undersigned hereunder, who shall continue to remain bound by the obligated to perform under the Note and with respect to this Guaranty as though there had been no such assignment.

13.     Warranties. Guarantor makes to the Funds the following representations and warranties:

(a) Authorization. Guarantor has full right, power, and authorization to enter into this Guaranty and carry out his Obligations hereunder;

(b) No Conflict. The execution, delivery and performance by the Guarantor of this Guaranty will not violate or be in conflict with, results in a breach of, or constitute a default under, any indenture, agreement or any other instrument to which Guarantor is a party or by which Guarantor or any of his assets or properties is bound, or any order, writ, injunction or

decree of any court or governmental institute.

(c) Litigation.  There are no actions, suits or proceedings pending or to the knowledge of the Guarantor, threatened against or adversely affecting any Guarantor at law or in equity or before or by governmental agency or instrumentality which involves any of the transactions herein contemplated, or the possibility of any judgment or liability which may result in any material and adverse change in the financial condition of any Guarantor.  Guarantor is not in default with respect to any judgment, order, writ, injunction, decree, rule or regulation of any court.

(d) Enforceability.  This guaranty is a legal, valid and binding obligation of Guarantor, enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

14.    Notices.  All notices or other communications required or permitted hereunder shall be (a) in writing and shall be deemed to be given when either (I) delivered in person, (II) three (3) days after deposit in a regularly maintained receptor of the United States mail as registered or certified mail, postage prepaid, (III) when received if sent by private courier or service, or (IV) on the day on which Guarantor refuses delivery by mail or by private courier service, and (b) addressed as follows:

In Case of Guarantor:              In Case of the Fox Valley Funds:
Scott Brewer                   Dowd, Bloch & Bennett
3432 S. Normal Avenue        8 S. Michigan Avenue, 19th Floor
Chicago, IL 60618            Chicago, IL 60603

                                  In Case of the Laborers' Funds:
                                  Laborers Pension & Welfare Fund
                                  Attn: Patrick T. Wallace, Collection Counsel
                                  Sub Office
                                  53 W. Jackson Blvd., Suite 550
                                  Chicago, IL 60604

or such other addresses as may from time to time be designated by the party to be addressed by notice to the other in the manner provided.  The Funds will use their best efforts to send courtesy copies of notices provided hereunder to Guarantor's attorney should one be retained and information be provided for the attorney.  But failure by the Funds to send courtesy copies to Guarantor's attorney shall not limit or restrict the Funds' rights under this Guaranty in any manner nor relieve Guarantor or any obligations under this guaranty.

16.    Additional Waivers.  Guarantor expressly and unconditionally waives, in connection with any suit, action or proceeding brought by the Funds on this Guaranty, any and every right he may have to (I) injunctive relief, (II) trial by jury, (III) interpose any counterclaim therein and (IV) seek to have the same consolidated with any other or separate suit, action or proceeding.

09/10/2007  04:49    17736245033                    BREWER CONCRETE                    PAGE  03
09/10/2007  15:48    3123726599                    DOWD BLOCH & BENNETT            PAGE  11/25

17    Severability.  If all or any portion of any provision of this Guaranty is declared or found by a court of competent jurisdiction to be unenforceable or null and void, such provision or portion thereof shall be deemed stricken and severed from this Guaranty and the remaining provision and portions hereof shall continue in full force and effect.

18    Applicable Law; Venue.  This Guaranty and the transactions evidenced hereby shall be construed and interpreted under the laws of the State of Illinois.  Guarantor, in order to induce the Funds to accept this Guaranty and enter into the loan agreement, and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agrees that all actions or proceedings arising directly, indirectly, or otherwise in connection with, out of, related to or from this Guaranty shall be litigated, at the Funds' sole discretion and election, only in courts having situs within the county of Cook, State of Illinois, Eastern Division.  Guarantor hereby waivers any right he may have to transfer or change venue or any litigation brought against him by the Funds on this agreement in accordance with this paragraph.

19.    Time of the Essence.  Time is of the essence of this Guaranty as to the performance of the undersigned.

20.    Death of the Guarantor.  In the event of the death of the Guarantor, the Funds shall have the right to accelerate the indebtedness evidenced by the Note unless, within sixty (60) days of his death, Guarantor's estate assumes his obligations hereunder by an instrument satisfactory to the Funds and delivers to the Funds security for performance of such obligations.

21.    Copy.  A faxed copy shall be as valid as an original.

IN WITNESS WHEREOF, the undersigned Guarantor has executed this instrument as of the date and year first above written.

Name:  _Scott Brewer_____

Social Security Number: _____

APPROVED AS TO FORM AND SUBSTANCE
ON BEHALF OF THE GUARANTOR:

_____

Signature

Date:  _9/10/07_____

# COMMERCIAL SECURITY AGREEMENT

**A.    PARTIES**

1.    Brewer Concrete Construction, Inc., (Referred to herein as "Company Debtor")
c/o Scott Brewer, President
3432 S. Normal Avenue
Chicago, IL 60616

Scott Brewer   (Referred to herein as "Individual Debtor")
321 E. 17th Street
Chicago, IL 60616
(Company Debtor and Individual Debtor collectively referred to herein as "Debtors")

2.    The Fox Valley Laborers' Health & Welfare and Pension Funds (the "Fox Valley Funds")
2400 Big Timber Rd., Building B, Suite 206
Elgin, IL 60123

Laborers' Pension Fund and Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (the "Laborers' Funds")
11465 Cermak Road
Westchester, IL 60154

Construction and General Laborers District Council of Chicago and Vicinity (the "District Council")
999 McClintock Drive, Suite 300
Burr Ridge, IL 60527
(Fox Valley Funds, Laborers' Funds, and District Council, collectively referred to herein as "Secured Party")

**B.    CREATION OF SECURITY INTEREST**

Subject to the terms of this security agreement ("Agreement"), the Debtors grant to Secured Party a continuing security interest in the Collateral to secure the payment of the Obligation.

**C.    OBLIGATION**

The obligation secured by this Agreement ("Obligation") is:

1.    The Debtors' obligations to pay applicable union dues and fringe benefits under the terms of a collective bargaining agreement;

2.    The Debtors' obligations under the terms of the Installment Note covering delinquencies to the Fox Valley Funds for the period December 2006 through June



2007 and to the Laborers' Funds for the period of May 2007 through June 2007;

3    All existing and future liabilities, of any kind, nature, or description, of Debtors to Secured Party arising out of any loan, labor contract, agreement, assignment, endorsement, guarantee, security agreement, federal law, or other transaction, regardless of any other collateral or security delivered or held in connection therewith;

4    All costs incurred by Secured Party to obtain, preserve, or enforce this security interest, collect the Obligation, or maintain or preserve the Collateral, including (but not limited to) taxes, assessments, insurance premiums, repairs, reasonable attorneys' fees and legal expenses, rent, storage costs, and expenses of sale; and

5.    Interest and liquidated damages on the above amounts at the maximum rate permitted by law.

This is a continuing security agreement and will continue in effect even though all or any part of the Obligation is paid in full and even though for a period of time Debtors may not be indebted to Secured Party.

**D.    COLLATERAL**

The property to which the security interest attaches under this Agreement ("Collateral") is:

1.    All equipment, as that term is defined in the Illinois Uniform Commercial Code, now owned or hereafter acquired by Debtors;

2.    All accounts, as that term is defined in the Illinois Uniform Commercial Code, now or hereafter in existence of Debtors;

3.    All substitutes and replacements for, accessions, attachments, and other additions to, and tools, parts, accessories and supplies used in connection with, any property described in this Collateral section, now owned or hereafter acquired by Debtors;

4.    All products and produce of any property described in this Collateral section;

5.    All proceeds (including insurance proceeds) from the sale, destruction, loss or other disposition of any property described in this Collateral section;

6.    All records and data (including, but not limited to, ledger sheets, files, documents, photographs, microfilm, microfiche, and electronic media) evidencing an interest in or relating to any property described in this Collateral section, together with all of Debtors' right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media; and

**E.    AGREEMENTS AND WARRANTIES OF DEBTORS**

1.    **Title.** Debtors represent and warrant to Secured Party that the Company-Debtor or Individual-Debtor or both Debtors hold good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement (and the same will be true of Collateral acquired hereafter when acquired), and that none of the Collateral is affixed to real estate or an accession to other goods, nor will Collateral acquired hereafter be affixed to real estate or an accession to other goods when acquired, unless Debtors have furnished Secured Party the consents or disclaimers necessary to make this security interest valid against persons holding interest in the real estate or other goods. No financing statement covering any of the Collateral is on file in any public office other than those that reflect the security interest created by this Agreement or to which Secured Party has specifically consented. Debtors shall defend Secured Party's rights in the Collateral against the claims and demands of all other persons.

2.    **Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, the Collateral is enforceable in accordance with its terms, is genuine, and complies with applicable laws concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Secured Party, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor for goods sold or services performed by Debtors, and there shall be no setoffs or counterclaims against any such account, and no agreement under which any deductions or discounts may be claimed shall have been made with the account debtor except those disclosed to Secured Party in writing.

3.    **Perfection of Security Interest.** Debtors agree to execute such financing statements and to take whatever other actions are requested by Secured Party to perfect and continue Secured Party's security interest in the Collateral. Upon request of the Secured Party, Debtors will deliver to Secured Party any and all of the documents evidencing or constituting the Collateral, and Debtors will note Secured Party's interest upon any and all chattel paper if not delivered to Secured Party for possession by Secured Party. Debtors hereby appoint Secured Party as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or continue the security interest granted in this Agreement. Secured Party may at any time, and without further authorization from Debtors, file a carbon, photographic or other reproduction of any financing statement or of the Agreement for use as a financing statement. Debtors will reimburse Secured Party for all expenses for the perfection and the continuation of the perfection of Secured Party's security interest in the

-3-

collateral.

4.    **Collateral Schedules.** Debtors, as often as Secured Party may require, shall deliver to Secured Party, in form satisfactory to Secured Party a schedule of real properties and Collateral locations relating to Debtors' operations (including all subsidiaries and related companies), including without limitation the following: (a) all real property owned or being purchased by Debtors; (b) all real property being rented or leased by Debtors; (c) all storage facilities owned, rented, leased, or being used by Debtors; and (d) all other properties where Collateral is or may be located. Such schedule shall contain such information as Secured Party may require to identify the nature, extent, and location of Collateral (or to the extent the Collateral consists of intangible property such as accounts, the records concerning the Collateral). To the extent the Collateral consists of accounts, the schedule shall contain such information as Secured Party may require to identify the nature and age of accounts and the names of account debtors.

5.    **Removal of Collateral.** Debtors shall keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts, the records concerning the Collateral) at Debtors' address shown above, or at such other locations as are acceptable to Secured Party. Except in the ordinary course of its business, including the sale of inventory, Debtors shall not remove the Collateral from its existing locations without the prior written consent of Secured Party. To the extent that the Collateral consists of vehicles or other titled property, Debtors shall not take or permit any action which would require application for certificates of title for the vehicle outside the State of Illinois, without the prior written consent of Secured Party.

6.    **Transactions Involving Collateral.** Except for inventory sold in the ordinary course of Debtors' business, Debtors shall not sell, lease, manufacture, process, assemble, furnish under contracts of service, or otherwise transfer or dispose of the Collateral. While Debtors are not in Default under this Agreement, Debtors may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Debtors' business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Debtors shall not pledge, mortgage, encumber of otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Secured Party, even if junior in right to the security interest granted under this Agreement. Debtors shall not allow the Collateral to become an accession to other goods or to become affixed to real estate. Unless waived by Secured Party, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Secured Party and shall not be commingled with any other funds; however, this requirement shall not constitute consent by Secured Party to any sale

or other disposition. Upon receipt, Debtors shall immediately deliver any such proceeds to Secured Party.

7.    **Maintenance and Inspection of Collateral.** Debtors shall maintain all tangible Collateral in good condition and repair. Debtors will not cause or permit damage to or destruction of the Collateral or any part of the Collateral. Secured Party and its designated representatives and agents shall have the right at all reasonable times to examine, inspect, and audit the Collateral wherever located. Debtors shall immediately notify Secured Party of all occurrences affecting the Collateral or the value or amount of the Collateral, including, but not limited to, any loss of or damage to tangible Collateral, any request for credit or adjustment to any account, or any dispute arising with respect to any Collateral.

8.    **Maintenance of Casualty Insurance.** Debtors shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Secured Party may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Secured Party and issued by a company or companies reasonably acceptable to Secured Party. Debtors, upon request of Secured Party, will deliver to Secured Party from time to time the policies or certificates of insurance in form satisfactory to Secured Party, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Secured Party and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Secured Party will not be impaired in any way by any act, omission or default of Debtors or any other person. In connection with all policies covering assets in which Secured Party holds or is offered a security interest, Debtors will provided Secured Party with such loss payable or other endorsements as Secured Party may require. If Debtors at any time fails to obtain or maintain any insurance as required under the Agreement, Secured Party may (but shall not be obligated to) obtain at Debtors' expense such insurance as Secured Party deems appropriate, including if it so chooses "single interest insurance," which will cover only Secured Party's interest in the Collateral.

9.    **Application of Insurance Proceeds.** Debtors shall promptly notify Secured Party of any loss or damage to the Collateral. Secured Party may make proof of loss if Debtors fail to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Secured Party, to be distributed as follows: If Secured Party consents to repair or replacement of the damaged or destroyed Collateral, Secured Party shall, upon satisfactory proof of expenditure, pay or reimburse Debtors from the proceeds for the reasonable cost of repair or replacement. Any remaining proceeds shall be first applied toward the Obligation, with any balance distributed to Debtors. If Secured Party does not consent to repair or replacement of the Collateral, Secured Party shall

retain a sufficient amount of the proceeds to pay the Obligation, and shall pay the balance to Debtors.

10. **Insurance Reports.** Debtors, upon request of Secured Party, shall furnish to Secured Party reports on each existing policy of insurance showing such information as Secured Party may reasonably request, including the following: (a) the name of the insurer; (b) the risks insured; (c) the amount of the policy; (d) the property insured; (e) the then-current value on the basis of which insurance has been obtained and manner of determining that value; and (f) the expiration date of the policy. In addition, Debtors shall upon request by Secured Party have an independent appraiser satisfactory to Secured Party determine, as applicable, the cash value or replacement cost of the Collateral.

11. **Taxes, Assessments and Liens.** Debtors will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, this Agreement, and any promissory note or notes evidencing the Obligation and related documents executed in connection with the Obligation. Debtors may in good faith commence an appropriate proceeding to contest such tax, assessment, or lien, and may withhold payment during any such proceedings, including appropriate appeals, so long as, in Secured Party's sole opinion, Secured Party's interest in the Collateral is not jeopardized by such action. If the Collateral is subject to a lien which is not discharged within fifteen (15) days, Debtors shall deposit with Secured Party cash, a sufficient corporate surety bond or other security satisfactory to Secured Party in any amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Debtors shall defend itself and Secured Party, and shall satisfy any final adverse judgment before enforcement against the Collateral. Debtors shall name Secured Party as an additional obligee under any surety bond furnished in the contest proceedings.

12. **Compliance with Governmental Regulations.** Debtors shall comply with all laws, ordinances, rules, and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral. Debtors may in good faith commence an appropriate proceeding to contest such law, ordinance, rule, or regulation, and may withhold compliance during any such proceedings, including appropriate appeals, so long as, in Secured Party's sole opinion, Secured Party's interest in the Collateral is not jeopardized by such action.

13. **Indemnification.** Debtors assume liability for, and agrees to indemnify and hold Secured Party harmless from and against, and covenants to defend Secured Party against, all claims, causes of action, liabilities, and damages of any kind arising out of or related to the use, maintenance, possession, or management of the Collateral. This agreement to indemnify shall survive the payment of the Obligation and the

satisfaction of this Agreement.

14. **Hazardous Substances.** Debtors represent and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any hazardous waste or substance, as those terms are defined in the Comprehensive Environmental Response, Compensation, and Liability At of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No., 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "hazardous waste" and "hazardous substance" shall also include, without limitation, petroleum and petroleum by-products, or any fractions thereof, and asbestos. The representations and warranties contained herein are based on Debtors' due diligence in investigating the Collateral for hazardous wastes and substances. Debtors hereby (a) release and waive any future claims against Secured Party for indemnity or contribution in the event Debtors become liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Secured Party against any and all claims and losses resulting from a breach of this provision of the Agreement. This agreement to indemnify shall survive the payment of the Obligation and the satisfaction of this Agreement.

15. **Change of Name or Address.** Debtors shall not change its name, or the location of its principal place of business, executive office, or the place where it keeps its business records without thirty (30) days prior written notice to Secured Party.

16. **No Violation.** Debtors are duly formed, organized, validly existing and in good standing in the state of its incorporation or organization, duly qualified and in good standing in every jurisdiction where the nature of its business requires it to be so qualified, and authorized by all requisite action of its stockholders and directors, general partners, or managers to execute, deliver and perform this Agreement.

F.   **POSSESSION OF COLLATERAL AND COLLECTION OF ACCOUNTS**

Until Default, and except as otherwise provided below with respect to accounts, Debtors may have possession and beneficial use of the Collateral, and may use it in any lawful manner not inconsistent with this Agreement, provided that Debtors' right to possession and beneficial use shall not apply to any Collateral of which possession by Secured Party is required by law to perfect Secured Party's security interest in such Collateral. Until otherwise notified by Secured Party, Debtors may collect any of the Collateral consisting of accounts. Without prior written consent of Secured Party, Debtors shall not grant any extension of the time of payment of any account, compromise any account for less than its full amount, release in whole or in party any person liable

for the payment of all or part of any account, or allow any credit upon an account except for the amount of cash paid thereon. Upon notice to Debtors, Secured Party may at any time prior to Default collect accounts and notify account debtors to make payments directly to Secured Party for application to the Obligation.

## G.    EXPENDITURES BY SECURED PARTY

Secured Party may (but shall not be obligated to) take any action that Debtors are required to take under this Agreement or that is otherwise necessary to obtain, preserve, and enforce this security interest or maintain and preserve the Collateral, without notice to Debtors, and add costs of same, including interest at the maximum rate provided by law from the date incurred to the date of repayment, to the Obligation.

## H.    REINSTATEMENT OF SECURITY INTEREST

If payment is made on the Obligation by Debtors, whether voluntarily or otherwise, or by any third party, and thereafter Secured Party remits any amount of that payment (a) by reason of any federal or state bankruptcy law or law for the relief of debtors to Debtors' trustee in bankruptcy or to any similar person, (b) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Secured Party or any of Secured Party's property, or (c) by reason of any settlement or compromise by Secured Party of any claim made by any claimant (including without limitation Debtors), such amount shall be considered not to have been paid for purposes of enforcement of this Agreement, and this Agreement shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or of any note or other instrument or agreement evidencing the Obligation, and the Collateral will continue to secure the amount repaid or recovered to the same extent as if that amount had never been received by Secured Party, and Debtors shall be bound by any judgment, decree, order, settlement or compromise relating to the Obligation or to this Agreement.

## I.    DEFAULT

Each of the following constitutes an event of default under this Agreement ("Default"):

1.    **Default on Obligation.**  Debtor's failure to make any payment when due under the terms of the Judgment;

2.    **Non-Compliance with Agreements.**  Debtors' failure to comply with or to perform any term, obligation, covenant or condition contained in the Judgment, this Agreement, the Labor Agreement between the Debtor-Company and the Laborers District Council, or any other agreement between Secured Party and Debtors;

3.    **Default to Third Parties.**  Debtor's default under any loan, extension of credit,

-8-

security agreement, Promissory Note, purchase or sales agreement, or any other agreement with any other person, that may materially affect any of Debtors' property or ability to repay the Obligation or perform its duties under this Agreement;

4.    **False Statements.**   Debtors' making any false or misleading warranty, representation, or statement to Secured Party relating to this Agreement;

5.    **Dissolution or Merger.**   The dissolution or termination of Company-Debtor's existence as a going business, or the merger or consolidation of Debtors with another entity;

6.    **Insolvency.**   The insolvency of Company-Debtor, the appointment of a receiver for any part of Company-Debtor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Company-Debtor and/or Individual-Debtor.

7.    **Collateral Loss or Damage.**   Loss, theft, substantial damage, destruction, sale, reduction in value, encumbrance of (other than pursuant to this Agreement), damage to, or change in the Collateral;

8.    **Judicial or Other Proceedings.**   Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Debtors or any governmental agency against the Collateral.   Commencement of such proceedings shall not constitute an event of default if there is a good faith dispute by Debtors as to the validity or reasonableness of the claim which is the basis of the proceeding and if Debtors give Secured Party written notice of the proceeding and deposits with Secured Party monies or a surety bond for the proceeding, in an amount determined by Secured Party, in its sole discretion, as being an adequate reserve or bond for the dispute;

9.    **Events Affecting Guarantor.**   The occurrence of any of the preceding events with respect to any Guarantor of any part of the Obligation, or the death or incompetence of such Guarantor.   Secured Party, at its option, may but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Secured Party and, in doing so, cure the Default;

10.    **Adverse Change.**   The occurrence of a material adverse change in Debtors' financial condition, or the belief of Secured Party that the prospect of payment or performance of the Obligation is impaired;

11.    **Insecurity.**   Secured Party, in good faith, deems itself insecure.

If any Default, other than Debtors' failure to make payment when due under the Judgment, is curable and if Debtors have not been given prior notice of the Default, it may be cured (and no Default will have occurred), if Debtors, after Secured Party send written notice demanding cure of such Default, (a) cures the default within five days, or (b) if the cure requires more than five days, immediately initiates steps that Secured Party deems in its sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

## J.     RIGHTS AND REMEDIES ON DEFAULT

If Default occurs under this Agreement, at any time thereafter Secured Party shall have all the rights of a secured party under the Illinois Uniform Commercial Code.  In addition, and without limitation, Secured Party may exercise any one or more of the following rights and remedies:

1.     **Accelerate Obligation.** Secured Party may declare the entire Obligation, including any prepayment penalty that Debtors would be required to pay, immediately due and payable, without notice.

2.     **Assemble Collateral.** Secured Party may require Debtors to deliver to Secured Party all or any portion of the Collateral and any and all certificates of title and other documents related to the Collateral.  Secured Party may require Debtors to assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party.  Secured Party also shall have full power to enter upon the property of Debtors to take possession of and remove the Collateral.  If the Collateral contains other goods not covered by this Agreement at the time of repossession, Debtors agree that Secured Party may take such other goods, provided the Secured Party makes reasonable efforts to return them to Debtors after repossession.

3.     **Sell the Collateral**. Secured Party shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in its own name or that of Debtors. Secured Party may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will give Debtors reasonable notice of the time after which any private sale or any other intended disposition of the Collateral is to be made. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligation secured by this Agreement and shall be payable on demand, with interest at the maximum rate provided by law from the date incurred to the date of repayment.

4. **Appoint Receiver.** To the extent permitted by applicable law, Secured Party may have a receiver appointed. The receiver may be an employee of Secured Party and may serve without bond, and all fees of the receiver and his or her attorneys shall become part of the Obligation and shall be payable on demand, with interest at the maximum rate provided by law from the date incurred to the date of repayment.

5. **Collect Revenues, Apply Accounts.** Secured Party, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Secured Party may at any time in its discretion transfer any Collateral into its own name or that of its nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Obligation or apply it to payment of the Obligation in such order of preference as Secured Party may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Secured Party may demand, collect, receipt for, settle, compromise, adjust, sue to foreclose, or realize on the Collateral. For these purposes, Secured Party may, on behalf of and in the name of Debtors, receive, open and dispose of mail addressed to Debtors, change any address to which mail and payments are to be sent, and endorse notes, checks, drafts, money orders, documents of title instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Secured Party may notify account debtors and obligors on any Collateral to make payments directly to Secured Party.

6. **Obtain Deficiency.** If Secured Party chooses to sell any or all of the Collateral, Secured Party may obtain a judgment against Debtors for any deficiency remaining on the Obligation after application of all amounts received from the exercise of the rights provided in this Agreement.

7. **Other Rights and Remedies.** Secured Party shall have all the rights and remedies of a secured party under the provisions of the Illinois Uniform Commercial Code, as may be amended from time to time. In addition, Secured Party shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

All of Secured Party's rights and remedies, whether evidenced by this Agreement or any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Secured Party to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform any obligations of Debtors under this Agreement, after Debtors' failure to perform, shall not affect Secured Party's right to declare a Default and to exercise its remedies.

## K.    MISCELLANEOUS PROVISIONS

-11-

1.    **Amendments.** This Agreement, together with all documents executed in connection with the Obligation, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

2.    **Applicable Law.** This Agreement has been delivered to Secured Party and accepted by Secured Party in the State of Illinois. If there is a lawsuit, Debtors agree upon Secured Party's request to submit to the jurisdiction of the courts of the State of Illinois.  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

3.    **Expenses.**  Debtors assume and agree to indemnify, pay and hold harmless Secured Party and its trustees, employees and agents from all expenses, losses, costs, claims, actions, causes of action, damages of any kind, liabilities, expenses and attorneys fees and costs that Secured Party may incur or sustain in obtaining or enforcing payment or performance of the Obligation, in exercising its rights and remedies under this Agreement, or in connection with any action, proceeding, or appeal arising out of or related to this Agreement, the Obligation, or the Collateral, whether brought by Secured Party, Debtors or any third party.

4.    **Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not be used to interpret or define the provisions of this Agreement.

5.    **Signatories for Debtors.**  If more than one person executes this Agreement as a Debtor, their obligations under this Agreement shall be joint and several.

6.    **Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by telefacsimile (unless otherwise required by law), and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address show above. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. To the extent permitted by applicable law, if there is more than one Debtor, notice to any Debtor will constitute notice to all Debtors. For notice purposes, Debtors will keep Secured Party informed at all times of Debtors' current address(es).

7.    **Power of Attorney.** Debtors hereby appoint Secured Party as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following: (a) to demand, collect, receive, receipt for, sue and recover all sum of money or other

-12-

property which may now or hereafter become due, owing or payable from the Collateral; (b) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (c) to settle or compromise any and all claims arising under the Collateral; and, if the place and stead of Debtors, to execute and deliver its release and settlement for the claim; and (d) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Debtors, or otherwise, which in the discretion of Secured Party may seem to be necessary or advisable. This power is given as security for the Obligation, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by Secured Party.

8.  **Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstances, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall he stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

9.  **Successor Interests.** Subject to the limitations set forth above on transfer of the Collateral, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

10. **Waiver.** Secured Party shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any right shall operate as a waiver of such right or any other right. A waiver by Secured Party of a provision of this Agreement shall not prejudice or constitute a waiver of Secured Party's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Secured Party, nor any course of dealing between Secured Party and Debtors, shall constitute a waiver of any of Secured Party's rights or of any of Debtors' obligations as to any future transactions. Whenever the consent of Secured Party is required under the Agreement, the granting of such consent by Secured Party in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all case such consent may be granted or withheld in the sole discretion of Secured Party.

11. **Prior Agreement.** The Debtors acknowledge that this agreement shall not replace or affect the rights of the Secured Party under the prior Security Agreement entered into between the Debtors and the Secured Party to cover prior delinquencies to the Laborers' Funds for amounts due as a result of an audit covering the period of March 18, 2004 through October 31, 2005, liquidated damages on late payments for the

-13-

09/10/2007  04:49    17736245033                BREWER CONCRETE                      PAGE  04

09/10/2007  15:48    3123726599                 DOWD BLOCH & BENNETT                 PAGE  25/25

months of February through May 2005, attorneys' fees and costs, liquidated damages on late paid dues reports for the period of April 2004 through September 2005, delinquent contributions, liquidated damages, interest, audit costs, and interest owed to the Fox Valley Funds for March 18, 2004 through October 31, 2005. All named secured parties named under this Security Agreement shall be secured parties under the prior Security Agreement and this Agreement, both of which shall provide continuing security interests.

**DEBTORS ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT, AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED _____ 2007.**

Company Debtor:

By: _____ Scott Brewer

Its: _____ President _____

Individual Debtor:

By: _____ Scott Brewer

-14-